**SO ORDERED.**

**SIGNED June 13, 2008.**



_____
ROBERT SUMMERHAYS
UNITED STATES BANKRUPTCY JUDGE

_____

```
            UNITED STATES BANKRUPTCY COURT
             WESTERN DISTRICT OF LOUISIANA

IN RE:

CANAL REFINING COMPANY,                        CASE NO. 00-50847

    Debtor                                         Chapter 7
-----------------------------------------------------------------
                     MEMORANDUM RULING
-----------------------------------------------------------------
```

The present matter comes before the court as a Motion for Payment of Claim, or, in the Alternative, for an Interim Distribution ("Motion for Payment") filed by URL Corporation. URL filed a $104,185.17 unsecured proof of claim for engineering and design services allegedly performed by URL's predecessor, Walk Haydel. URL seeks an order requiring Simmons Sandoz, the duly-appointed Chapter 7 trustee in this case (the "Trustee"), to pay URL's claim in full from the remaining funds in Canal's bankruptcy case. The parties agree that the funds remaining in the bankruptcy estate are sufficient to pay URL's claim. However, the Trustee has

opposed URL's Motion for Payment on the grounds that Canal never entered a contract with Walk Haydel and never authorized the work reflected by URL's claim. Following an evidentiary hearing on URL's motion, the court took the matter under advisement. After considering the record and the relevant authorities, the court overrules the Trustee's opposition to URL's Motion, and **GRANTS** URL's Motion for Payment. The following summarizes the relevant evidence and reasons underlying the court's ruling in this regard.

URL offered the testimony of Al Smith, the Walk Haydel project manager in charge of the Canal project. Mr. Smith testified as follows:

1. Canal invited Walk Haydel to submit a proposal for design and engineering work relating to a crude unit "debottlenecking" project early in 1999. Canal ultimately hired Walk Haydel for the project in or around November 1999. Walk Haydel's primary contact at Canal was Fred Marshall, Canal's Refinery Manager.

2. Dean Cunningham, a Walk Haydel process engineer, was responsible for coordinating and participating in the on-site evaluation of Canal's facilities and equipment. Mr. Cunningham met periodically with Canal personnel during the course of these on-site evaluations.

3. Mr. Smith attended two on-site meetings at Canal: a "kick-off" meeting on or around November 11, 1999, and a status meeting on December 2, 1999. Mr. McKee, Mr. Marshall, and Max Menard (Canal's Executive Vice President for Refinery Operations) attended the December 2nd meeting. Mr. Menard may have also attended the November 11th meeting.

4. During the December 2nd meeting, the Walk Haydel project team outlined the progress of the project and the status

-2-

of the design and engineering work that had been performed to date on behalf of Canal as well as the work required to complete the project. According to Mr. Smith, both Mr. McKee and Mr. Menard asked questions and made comments on the progress of the work during this meeting. Walk Haydel's presentation included a discussion of the fees incurred through December 2nd – approximately $22,600. None of Canal's representatives raised any question at the meeting with respect to the existence of a contract between Canal and Walk Haydel, or whether the work performed by Walk Haydel had been authorized.

5. The Walk Haydel team also prepared weekly status reports that outlined the work performed by Walk Haydel and the amount of fees incurred as of the date of each report. Walk Haydel also sent regular invoices to Canal. The status reports were sent to Mr. Marshall, and the invoices were sent to Mr. Menard.

6. According to Mr. Smith, the Walk Haydel team stopped work on the Canal project in January or February of 2000 when Canal refused to pay for the fees incurred to date on the project. At the time, Walk Haydel had completed approximately 90% of the design work on the project.

The exhibits introduced by URL include a November 3, 1999 document titled Revised Proposal for Crude Unit Debottlenecking (the "Revised Proposal"), which outlines the scope of the project. The last page of the Revised Proposal is signed with the name "Robert McKee" printed beneath the signature. A second document titled Fee Plan Agreement is attached to the Revised Proposal, and is signed on behalf of Canal. However, the signature page of this second document does not identify who signed on behalf of Canal. As explained below, Canal and the Trustee question the validity of the signatures. Finally, URL introduced copies of the weekly

-3-

status reports sent to Canal, copies of engineering drawings completed by Walk Haydel, and Mr. Smith's detailed notes from the December 2nd meeting between Canal and Walk Haydel. These meeting notes were created shortly after the meeting and corroborate Mr. Smith's account of the meeting, including the attendance of Mr. McKee and Mr. Menard.

The Trustee disputes whether there was a valid contract between Walk Haydel and Canal, and contends that Canal did not authorize Walk Haydel to perform any work on the debottlenecking project. In this regard, the Trustee offered the testimony of Mr. McKee and Mr. Menard. The key points of this testimony are as follows:

1. Mr. McKee testified that he never hired Walk Haydel for the crude unit debottlenecking project, and that no one else at Canal was authorized to enter into a contract with Walk Haydel. With respect to the two signed agreements, Mr. McKee testified that the signature on the Revised Proposal is not his signature. With respect to the signature on the last page of the Fee Plan Agreement, Mr. McKee did not recognize the signature.

2. Mr. Menard similarly testified that he does not recall hiring Walk Haydel or authorizing anyone at Canal to hire Walk Haydel.

3. Despite their testimony that Walk Haydel had not been hired by Canal, however, neither Mr. McKee nor Mr. Menard denied that they were aware that Walk Haydel was performing design and engineering-related work during the November-December 1999 time frame. Nor do they deny that they attended either the November 11th kick-off meeting or the December

-4-

> > 2nd status meeting. Instead, they testified that they "may" have attended either meeting, but that they have no specific recollection of which meeting they attended.
>
> 4. Mr. Menard testified that he left his position with Canal in November 1999, but he concedes that he may have participated in at least one meeting with Walk Haydel.
>
> 5. Finally, on cross examination, Mr. McKee conceded that he would be entitled to a share of funds remaining in Canal's bankruptcy estate after all creditors are paid. Accordingly, if URL's claim is denied, these funds would remain in the estate and Mr. McKee would be entitled to a share of those funds.

After reviewing the record, the court concludes that URL has met its burden with respect its claim. The record supports URL's position that there was a valid contract between Canal and Walk Haydel. Although neither party has established the identity or validity of the signatures on the Revised Proposal or the Fee Plan Agreement, these documents are not the sole evidence of a contract between Walk Haydel and Canal. The testimony of the witnesses (including Mr. McKee and Mr. Menard) and the documents in the record support URL's position that Canal hired Walk Haydel for the debottlenecking project. Walk Haydel submitted a proposal for the project at the request of Canal. Both of Canal's witnesses acknowledge the proposal by Walk Haydel. Although Mr. McKee now denies that Canal entered into a contract with Walk Haydel, his conduct and the conduct of other Canal representatives at the time

-5-

is consistent with the existence of a enforceable contract. Both Mr. McKee and Mr. Menard participated in meetings during which Mr. Smith and other Walk Haydel representatives outlined the scope of the project, the work that had been performed, and the amount of fees that had been incurred. The written project status reports and the invoices sent to Canal further corroborate the contract between Canal and Walk Haydel. At no point from November 1999 through January 2000 did Mr. McKee or anyone else at Canal disavow the contract or instruct Walk Haydel to stop working despite their knowledge of the work performed by Walk Haydel and the amount of fees incurred on the project. Simply put, Canal's position nine years later that it had no enforceable agreement with Walk Haydel is not credible in light of the conduct of both parties at the time. See 1436 Jackson Joint Venture v. World Construction Company, Inc., 499 So. 2$^d$ 426, 427 (La. App, 4th Cir. 1986). ("Appellant's attack on the validity of the contract on the basis that the joint venture failed to prove the signature is without merit. It is obvious by the conduct of the parties as well as other facts entered into evidence that there was an obligation to perform on the part of the defendant.")

Similarly, the record does not support Canal's contention that Mr. Marshall was not authorized to hire Walk Haydel and, accordingly, any contract executed by Mr. Marshall was invalid.

-6-

For the same reasons outlined above, Canal's conduct in 1999 and 2000 refutes this argument. Mr. McKee's and Mr. Menard's participation in project meetings in November and/or December 1999 without comment as to the validity of the contract or Mr. Marshall's authority to hire Walk Haydel undercuts their current testimony that Mr. Marshall had no such authority. Mr. McKee also testified that Mr. Marshall had acted on behalf of Canal in prior matters. At a minimum, Mr. Marshall had apparent authority to enter into a contract with Walk Haydel. 7 La. Civ. Law Treatise, Business Organizations §21.04 (2007) (the actions of corporate officers "bind the corporation in the same way that the acts of any agent would bind the corporation, by means of actual authority, apparent authority, or ratification."); First Interstate Bank of Texas v. First National Bank of Jefferson, 928 F.2d 153 (5th Cir.1991) (permitting inference of actual and apparent authority to bind bank based on conduct of bank officers).

Finally, even if Mr. Marshall did not have authority to hire Walk Haydel, Canal ratified the contract by its conduct in 1999 and 2000. A corporation may be bound by an act of a corporate official even though the act by the official was without formal authority where it is shown that the corporation later ratified the act. See Kemna v. Warren, 514 So. 2nd 237,238 (La. App. 5th Cir. 1987) (ratification "may be expressed or implied, provided the action is

-7-

00-50847 - #522   File 06/13/08   Enter 06/13/08 13:34:55   Main Document   Pg 7 of 8

not prohibited by the corporate charter, by statute, or is not contrary to public policy."); 7 La. Civ. Law Treatise, Business Organizations §21.04 (2007).  "Ratification occurs when personnel with the authority to bind the corporation acquire knowledge of the unauthorized act and thereafter fail to repudiate it within a reasonable time." L & L Industries, Inc. v. Progressive Nat. Bank, 535 So.2d 1156, 1159 (La. App. 2 Cir. 1988). Here, representatives of Canal, including Mr. McKee, were fully aware of the work being performed by Walk Haydel. Representatives of Canal nevertheless allowed Walk Haydel to continue its work on the project and made no effort to disavow the agreement within a reasonable time.

For the foregoing reasons, the court **OVERRULES** the trustee's opposition, and **GRANTS** URL's Motion for Payment.  Counsel for URL shall submit an Order in conformity with the foregoing reasons within 20 days.

###